FILED

2013 Sep-26  AM 10:47
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ALABAMA NORTHWESTERN DIVISION

| | | |
|---|---|---|
| **WILLIAM D. SPOON**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **CIVIL ACTION NO.** |
| | ) | **3:12-CV-00036-KOB** |
| | ) | |
| **MICHAEL J. ASTRUE**, | ) | |
| Commissioner of the Social, | ) | |
| Social Security Administration, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

## I. INTRODUCTION

On January 30, 2007, the claimant, William D. Spoon, protectively filed for Social Security Disability Income under Title II of the Social Security Act and Supplemental Security Income under Title XVI of the Social Security Act. (R. 13, 35). The claimant alleged disability commencing on October 1, 2005 because of an enlarged heart, artery stints, back and chest problems, artery blockage, depression, and breathing problems. (R. 36). The Commissioner denied the claim on April 12, 2007 (R. 46), after which the claimant filed a timely request for a hearing before an Administrative Law Judge. (R. 51). The ALJ held the hearing on July 18, 2008. (R. 53).

On July 14, 2008, the claimant filed an affidavit alleging additional disabling impairments of obesity, chronic pain, chronic diarrhea, anxiety, shortness of breath, and fatigue, stipulating that none of these additional impairments met an impairment in the listing. (R. 193).

During the hearing before the ALJ, the claimant amended the onset date to September 15, 2006 following "res judicata" of a prior claim based upon the same disabilities through September 14, 2006. (R. 711).

In his August 14, 2008 decision, the ALJ found that the claimant was not disabled as defined by the Social Security Act and, thus, was ineligible for Social Security Disability Income and Supplemental Security Income. (R. 10). Following a timely appeal, the Appeals Council denied the claimant's request for a review on November 2, 2011, making the ALJ's decision the final decision of the Commissioner of the Social Security Administration. (R. 5, 8). The claimant has exhausted his administrative remedies. This court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, this court affirms the decision of the Commissioner.

## II. ISSUES PRESENTED

This court considers the following issues on review: (1) whether the ALJ properly determined the claimant's alleged depression, anxiety, and chronic diarrhea to be non-severe impairments; (2) whether the ALJ properly applied the Eleventh Circuit pain standard in discrediting the claimant's subjective testimony regarding his limitations; and (3) whether the ALJ correctly assessed the claimant's residual functional capacity as sedentary.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if the factual conclusions are supported by substantial evidence. See 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir.

1987). "No…presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations de novo. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To make this determination, the Commissioner employs a five-step, sequential evaluation process:

(1) Is the claimant presently unemployed?
(2) Is the claimant's impairment severe?
(3) Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. pt. 404, subpt. P, app. 1?
(4) Is the claimant unable to perform his or her former occupation?

3

(5) Is the claimant unable to perform any other work within the economy?

An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

In determining whether the claimant possesses a severe impairment, the Commissioner must consider whether the impairment significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1521(a), 416.920(c); *see also* 20 C.F.R. § 404.921(a), *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997). Basic work activities include:

(1) Physical functions such as walking, standing, sitting, lifting, pulling, reaching, carrying, or handling; (2) Capacities for seeing, hearing, and speaking; (3) Understanding, carrying out, and remembering simple instructions; (4) Use of judgment; (5) Responding appropriately to supervision, co-workers, and usual work situations; and (6) Dealing with changes in a routine work setting.

20 C.F.R. §§ 404.1521(b), 416.921(b). A non-severe impairment is so slight and minimal in effect that it would not be expected to interfere with an individual's work activities, regardless of the individual's particular circumstances. *McDaniel*, 800 F.2d at 1031; *see also Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984).

In evaluating pain and other subjective complaints, the Commissioner must consider whether the claimant demonstrated an underlying medical condition, and *either* "(1) objective medical evidence that confirms the severity of the alleged pain arising from the condition *or* (2) that the objectively determined medical condition is of such a severity that it can reasonably be expected to give rise to the alleged pain." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (emphasis added); *see also* 20 C.F.R. §§ 404.1529, 416.929. The ALJ must articulate reasons for

4

discrediting the claimant's subjective testimony regarding his limitations, but is not required to cite the language of the pain standard in whole or in part. Instead, the ALJ must show through his discussion that he applied the appropriate standard. *Wilson v. Barnhart*, 284 F.3d 1219, 1225-26 (11th Cir. 2002).

The responsibility for determining the claimant's RFC rests with the ALJ. 20 C.F.R. §§ 404.1546(c), 416.946(c). An RFC assessment involves determining the claimant's ability to do work in spite of his impairments and in consideration of all relevant evidence. *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a). The ALJ makes this determination by considering the claimant's ability to lift weight, sit, stand, push, pull, etc. 20 C.F.R. §§ 404.1545(b), 416.945(b). The ALJ determines the claimant's RFC only after establishing the extent of the claimant's severe impairments. 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f). A statement from the claimant's treating physician declaring the claimant unable to work deserves careful consideration in any finding of disability; however, a treating physician's opinion may be discounted when it is not accompanied by objective medical evidence or is wholly conclusory. *Crawford v. Commissioner*, 363 F.3d 1155, 1159 (11th Cir. 2004); *see also Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991).

The C.F.R. classifies jobs in the national economy as belonging to one of four levels of exertion: sedentary, light, medium, or heavy. 20 C.F.R. §§ 404.1567, 416.967. The C.F.R. defines sedentary work as requiring extended periods of sitting; "lifting no more than 10 pounds;" occasional "lifting or carrying articles like docket files, ledgers, and small tools;" and occasional "walking and standing." 20 C.F.R. §§ 404.1567(a), 416.967(a). Social Security Rule 83-10 further defines "occasional" to describe up to one-third of the time. A sedentary worker

should not walk or stand more than two hours in an eight hour work day and should sit for approximately six hours of an eight hour work day. *Kelley v. Apfel*, 185 F.3d 1211, 1213 n. 2 (11th Cir. 1999).

## V. FACTS

*Summary*

Plaintiff was forty-two years of age at the onset of the alleged disability and forty-four at the time of the ALJ hearing. (R. 25). The claimant filed for disability on two previous occasions. (R. 711). The claimant was inconsistent in reporting his level of education last achieved, although the record is clear that he did not earn a high school diploma.[1]  He can read and write in English and has worked as a "cashier checker" and "stocker or…store's laborer." (R. 709).  He reported that he last worked in November 2005.  (R. 172).

In this case, the claimant originally alleged disability because of an enlarged heart, artery stints, back and chest problems, artery blockage, depression, and breathing problems. (R. 36). On July 14, 2008, the claimant alleged disability based on additional impairments of high blood pressure, obesity, chronic pain, chronic diarrhea, anxiety, shortness of breath, and fatigue. (R. 193). At the claimant's hearing, the ALJ summarized the alleged impairments as hypertension, hypercholesterolemia, morbid obesity, migraine headaches, obstruction sleep apnea, coronary artery disease status post 1 stent, arterial venous malformation in the right frontal lobe, depressive disorder with anxiety, bronchitis, laryngitis, esophagitis, and pedal edema. Counsel

---

[1]  During the hearing, the claimant testified that he had only achieved an eighth grade education. (R. 710). On May 5, 2005, during a consultative examination at Greenwood Pediatrics & Internal Medicine, the claimant reported completing the tenth grade. During intake at a mental health facility, he reported having completed eleventh grade. (R. 24).

for the claimant lodged no objections or additional impairments in response to this summary. (R. 712). Although not discussed during the hearing, the ALJ's decision addressed whether the claimant suffered severe impairments from chronic diarrhea and asthma. (R. 16-17).

*Physical Limitations*

The record contains evidence of the claimant's medical history dating back to 1991. The ALJ referenced the claimant's medical history going back to May 2005. The onset of his current disability claim is September 15, 2006 as a result of res judicata because of his two previous disability applications, which were both denied. (R. 13).

The claimant smoked tobacco for at least twenty years, had suffered from hypertension, obesity, and instances of lumbago since at least 1998, and was hospitalized because of bronchitis as early as 2002. (R. 255, 271, 323, 357). Since at least 2003, doctors have diagnosed the claimant with elevated cholesterol, or hypercholesterolemia. (R. 220-221). The claimant first reported chest pain in 2004. (R. 216). The claimant has received Medicaid since at least 2005, the same date he began reporting difficulty sleeping. (R. 205, 207).

From May 17, 2006 through his alleged onset date of September 15, 2006, the claimant sought treatment with Dr. Syed, who became the claimant's treating physician, on seven occasions: May 17, May 24, June 5, July 6, August 3, August 4, and August 17.  During these visits, Dr. Syed noted the claimant's hypertension controlled with medication; obesity; normal muscular skeletal and neurological systems; sleep disturbance issues ripe for a sleep study; and no shortness of breath except on the May 17 visit.  Dr. Syed noted a May 18th x-ray revealed left ventricle and left atrial enlargement and mild aortic dilatation. Dr. Syed also indicated that the claimant reported sharp chest pain on May 24 radiating to his left side with minimal exertion.

7

However, Dr. Syed reported that the claimant had normal heart functioning during the May 24, July 6, August 3, and August 4 examinations.  Dr. Syed noted edema in the claimant's lower extremities on May 24 and June 5, but found no edema during the July 6, August 3, and August 17 examinations. (R. 274-75, 279-81, 283-84, 295-99, 356, 419, 422-29).

On August 9, 2006 on referral by Dr. Syed, the claimant met with J. Greg Adderholt, MD, with Valley Neurosurgery. His interpretation of the MRI suggested a probable tumor, susceptible to dilation, growing from the meninges in the medial right frontal lobe and possible associated benign tumor with thick fibrous walls enclosing a vascular, blood filled space ("probable cavernous meningioma in the medial right frontal lobe" and possible "associated venous hemangioma"). He did not agree with Dr. Fritts from Helen Keller Hospital that the diagnosis was a likely arteriovenous malformation. He based his interpretation on the small size of the tumor, asymptomatic presentation of the claimant, and lack of recent hemorrhage. His recommendation was no acute intervention unless the claimant suffered uncontrollable seizures or hemorrhaging. (R. 312-313).

For the remainder of 2006, the claimant followed up with Dr. Syed on September 18 and December 5, with almost identical findings as discussed for his previous visits.  Dr. Syed did introduce Lunesta to treat suspected sleep apnea; the claimant reported on the December 5 visit that Lunesta seemed to help him.  (R. 410-17).

The claimant also sought treatment with Dr. Syed on January 4 and 18, again with similar findings. On January 18, 2007, the claimant complained of sudden onset chest pain, as well as mild back pain. The claimant described chest pain as pressure-like and sharp, located on the left side of the chest and radiating to the left arm. A chest x-ray from this visit showed a normal,

8

rather than enlarged, cardiac shadow. The claimant remained obese and hypertensive, with blood pressure controlled through medication. Auscultation of the lungs showed mild coarseness. The claimant's back pain did not lessen his range of motion. Dr. Syed found the claimant's abdomen soft and non-tender, but reported no nausea, vomiting, indigestion, heartburn, or abdominal pain. Dr. Syed continued to prescribe Lunesta to treat suspected sleep apnea. Dr. Syed also began prescribing Advicor to manage the claimant's hypercholesterolemia. In consideration of the claimant's other risk factors, Dr. Syed planned to refer him to a cardiologist. (R. 402-07, 443).

On January 25, 2007, the claimant sought treatment at Helen Keller Hospital on his own initiative after experiencing abdominal pain. Robert Dunn, MD, a radiologist at Helen Keller Hospital, interpreted the resulting CT scan as unremarkable and presenting a normal GI tract. (R. 441).

On January 29, 2007, Eliza Coffee Memorial Hospital admitted the claimant, who complained of prolonged recurrent chest pain radiating to the left arm and associated shortness of breath. The attending physician on admission, and later, the claimant's treating cardiologist, Surender Sandella, MD, diagnosed the pain as resulting from acute coronary syndrome, coronary artery disease, hypertension, tobacco abuse, and a family history of premature coronary artery disease. The claimant's patient history also indicated chronic diarrhea for the last twenty years. On January 30, 2007, Dr. Sandella treated the claimant with a combination of medication and insertion of a bare-metal stent. Dr. Sandella left no notations of permanent restrictions for the claimant following this procedure. (R. 374-376).

On February 7, 2007, the claimant returned to Dr. Syed for a follow-up visit. The claimant remained obese and hypertensive, controlling the latter condition through medication.

9

The claimant's musculoskeletal and ENT systems revealed normal functioning on examination. A chest x-ray from this visit recorded a normal, rather than enlarged, cardiac shadow. The claimant reported no back pain. (R. 397-398, 440).

On March 6, 2007, the claimant visited Dr. Sandella for a follow-up visit at the Heart Health Center. An EKG from this visit indicated sinus bradycardia, indicating a resting heartbeat under 60 beats per minute. (R. 391).

On March 12, 2007, the claimant visited Dr. Syed for a follow-up visit. The claimant remained obese and hypertensive. Dr. Syed deemed the claimant completely compliant to therapy managing his hypercholesterolemia. The claimant's respiratory, cardiovascular, and musculoskeletal systems revealed normal functioning on examination. (R. 393-396).

On March 16, 2007, the claimant completed a cardiovascular questionnaire submitted to him by the Disability Determination Service. He indicated that he walks for 15-20 minutes twice a day to lose weight. He stated walking for this duration causes him chest discomfort and back pain. The claimant also indicated on the questionnaire suffering from shortness of breath. The claimant stated that he can relieve shortness of breath by sitting down or undergoing a breath test. He also stated that he takes medicine to address this symptom. (R. 169-170).

On March 17, 2007, the claimant completed a work history report at the request of the Disability Determination Service. Detail on this application differs from work history reports related to the claimant's prior disability applications. However, based on this report, the claimant's last date of employment is November, 2005. (R. 105-112, 125-127, 172).

The claimant completed an undated daily activities questionnaire at the request of the Disability Determination Service. He indicated that he cooks and prepares meals, shops

independently for personal needs, performs several household chores while seated, and follows along with TV and radio programs. The claimant stated that he has regular weekly contact with friends and relatives outside the home and that he sometimes will watch and care for his granddaughter. (R. 181-183).

On April 11, 2007, Ms. Johnson, the disability specialist assigned to the claimant's application, completed a physical summary stating that the only new allegation since the claimant's last denial on September 14, 2006 was "carido stents." The summary also states that all other conditions were stable with medication "per the treating physician," whom Ms. Johnson did not identify. (R. 449).

That same day, Ms. Johnson completed a physical RFC assessment in response to the claimant's application for disability on January 30, 2007. She listed the primary diagnosis as coronary artery disease, a secondary diagnosis as essential hypertension, and an additional alleged impairment of obesity. This RFC recorded occasional and frequent maximum limits lifting or carrying as 20 pounds and 10 pounds respectively. Ms. Johnson found the claimant could stand or walk with normal breaks for about six hours in an eight-hour workday; could sit for about six hours in an eight-hour workday; and had no push or pull restrictions separate from the maximum weight limits previously listed. Ms. Johnson found occasional postural limitations for the claimant in climbing a ramp or stairs, balancing, stooping, kneeling, crouching, and crawling. However, in the final postural limitation category, she found he could never climb a ladder, rope, or scaffolds. Ms. Johnson found no limitations in the claimant's manipulative (reaching all directions, gross and fine manipulation, and skin receptors), visual (near and far acuity, depth perception, accommodation, color vision, and field of vision), and communicative

11

(hearing and speaking) functioning. Ms. Johnson found the claimant should avoid all exposure to hazards and concentrated exposure to cold, heat, wetness, humidity, and fumes or odors. Though she did not explain why, Ms. Johnson found the claimant's statements regarding the severity and functional limitations of his symptoms only partially credible. (R. 464-469).

On April 11, 2007, following submission of the claimant's physical and mental RFC assessment, Ms. Johnson, the disability specialist, completed a Vocational Rationale Form. Based on the content of the physical and mental RFC assessments, Ms. Johnson determined that the claimant could perform past relevant work of cashier "as it is usually performed in the national economy." (R. 151, 153).

On May 10 and May 17, 2007, the claimant made  follow-up visits to Dr. Syed. On examination, Dr. Syed noted that the claimant remained obese and that his hypertension was controlled with Metoprolol and Benazepril; Dr. Syed found contrasting signs in the claimant across several systems: unremarkable cardiovascular functioning but edema of the bilateral lower extremity; normal gait and station in the musculoskeletal system but the lower lumbar tender to palpation without accompanying decreased range of motion; no wheezing, coughing, or shortness of breath but coarse upper lobes in the respiratory system; and normal appearance and movement of the ENT system, but bilateral pharyngeal erythema. Furthermore, the claimant reported treating his continuing sleep disturbance through Lunesta. Dr. Syed deemed the claimant somewhat compliant to therapy for hypertension and sleep disturbance during the May 10 examination, but commented in his May 17 examination notes that the complainant was completely compliant with therapy. Although Dr. Syed did not identify a reason for finding the claimant "somewhat complaint," he did note that the claimant does not self-monitor his blood

12

pressure. (R. 577-578). Neurologically, the claimant reported migraine headaches accompanied by nausea on May 17. (R. 571-572).

On June 6, 2007, the claimant made a follow-up visit to Dr. Syed's office. Dr. Syed noted that the claimant remained obese and hypertensive, and only somewhat compliant with therapy, possibly because he was not self-monitoring his blood pressure. Examination showed that the claimant's cardiovascular, respiratory, and musculoskeletal systems were no different from previous visit. Examination revealed the claimant's migraine headaches had worsened because of a new condition of sinusitis. Dr. Syed's examination of the claimant's oropharynx revealed bilateral pharyngeal erythema and bilateral pustular pharyngeal drainage. The claimant also reported worsening diarrhea in response to any food consumption. Dr. Syed found the claimant's abdomen soft and non-tender on examination. (R. 566-568).

On June 8, 2007, the claimant made a follow-up visit to Dr. Syed's office. Per Dr. Syed's report, the claimant presented with an improvement of his sinusitis; the absence of coarse upper lobes on auscultation of the lungs; continuing headache; continuing edema of the bilateral lower extremity; soft and non-tender abdomen; no mention of lumbar pain or diarrhea; and continuing treatment of hypertension and depression through medication. (R. 562-563).

Two days later, on June 18, 2007, the claimant made another a follow-up visit to Dr. Syed's office. At this time, claimant reported recent chest pain that was not present at the time of the prior visit. The claimant described the pain as pressure-like and sharp on the left side of the chest. An EKG from this visit shows the claimant with sinus bradycardia. Examination showed the claimant remained obese and hypertensive, but completely compliant to therapy for hypertension. Dr. Syed noted the condition had significantly improved. On examination, the

claimant's respiratory, cardiovascular, and musculoskeletal systems showed normal functioning. The claimant's abdomen remained soft and non-tender. The claimant's test for cardiac enzymes was negative. The claimant made no mention of headache, lumbar pain, or diarrhea. (R. 553-554, 556, 560).

During a follow-up visit on June 26, 2007 with Dr. Sandella, the claimant reported an isolated occurrence of chest pain while moving residences but no recurrence since the episode. An EKG revealed a heartbeat of 45. Dr. Sandella noted the need to schedule a stress test to evaluate the claimant's bradycardia. He also stated the need to follow-up separate from the stress test. The claimant testified that the stress test never occurred because Dr. Sandella moved. (R. 647).

However, Dr. Sandella's records show administration of a stress test on July 18, 2007 at ECMH, with the results indicating a large fixed inferior wall defect. Dr. Sandella determined the bradycardia to be partially iatrogenic and recorded plans to treat through a dosage adjustment of metoprolol. The claimant listed his employment status as "disabled" on the hospital intake form. (R. 603-605, 722).

On July 25 and September 13, 2007, the claimant made follow-up office visits to Dr. Syed's office. On both visits, the claimants's respiratory, cardiovascular, and musculoskeletal systems were normal. An EKG showed unconfirmed sinus bradycardia and a chest x-ray showed a cardica shadow. Dr. Syed also listed an intention to provide a referral to a pulmonary specialist, though none was identified with specificity. (R. 537-48, 549-552). A year previously, at claimant's May 17, 2006 and June 5, 2006 visits, Dr. Syed made a note to refer the claimant to Dr. Ridgeway, a pulmonologist, for a sleep study. (R. 279-81, 296-99). Nothing in the record

14

indicates the claimant met with a pulmonary specialist or that Dr. Syed diagnosed the claimant with a pulmonary disease. Dr. Syed ceased prescribing Lunesta at the September 13, 2007 visit and did not prescribe it again before the ALJ hearing. (R. 537-48).

On September 24, 2007, the claimant visited Shoals Hospital complaining of vomiting blood. The claimant listed COPD, asthma, coronary artery disease, and hypertension on his medical history. Dr. Ernest Mollohan, O.D., found the claimant's respiratory, cardiovascular, gastrointestinal, and neurologic systems to be normal. The medical impression was sinusitis and upper respiratory infection. On the intake form, the claimant listed his employment status as "disabled." (R. 690-692).

On September 25, 2007, the claimant visited Dr. Syed's office. He complained of sinusitis, shortness of breath (dyspnea), cough, and diarrhea. The claimant's cardiovascular and musculoskeletal systems exhibited no signs of abnormality. Dr. Syed found expiratory wheezing over both lung fields, diminished breath sounds over the entire right lung, and coarse upper lobes that cleared and improved in response to "breathing treatment." Examination of the claimant's ENT symptoms revealed bilateral pharyngeal erythema of the oropharynx. A chest x-ray on this visit showed an enlarged cardiac shadow. (R. 528-530, 533-534).

On October 5, 2007, the claimant reported to Dr. Syed that he had not used medication to control hypertension, and Dr. Syed deemed the claimant somewhat compliant with ongoing hypertension. The claimant reported insomnia, cough and shortness of breath. Examination revealed normal functioning of the claimant's respiratory and cardiovascular systems. The claimant's abdomen was soft and non-tender. (R. 524-525).

On December 28, 2007, the claimant visited Helen Keller Hospital complaining of chest

15

discomfort. On the intake form, the claimant also indicated associated shortness of breath, excessive sweating, and fainting. The claimant admitted to being a smoker, as well as recent user of cocaine.  A chest x-ray showed no pulmonary infiltrate, a complete lack of pulmonary disease, and "approximately normal" heart size. The claimant then left Helen Keller Hospital after signing a form acknowledging that he did so against medical advice, despite the hospital's desire to admit him for observation in case the condition worse. (R. 617, 619, 620, 623).

On January 10, 2008, the claimant visited Dr. Syed's office.  Dr. Syed noted that the claimant had gained 30 pounds. The claimant reported insomnia controlled by Lunesta. However, the claimant's list of medications did not show any refills of Lunesta through the first six months of 2008. (R. 195-200A, 515-516, 518).

On January 11, 2008, the claimant visited Shoals Hospital complaining of abdominal pain. The claimant underwent an abdominal CT scan with and without contrast, as well as a CT scan of his pelvis. Donald Bowling, MD, a radiologist with Shoals Hospital, found no abnormalities in the pelvis. The claimant's body habitus impacted the clarity of the abdominal CT.  As a result, Dr. Bowling was unable to clear the pancreas, upper abdomen, or retroperitoneum. The kidneys appeared generally normal. The liver appeared hypodense while the spleen looked normal. Dr. Bowling found no abnormally enlarged intestines. (R. 686, 688).

On January 14, 2008, Dr. Sandella completed a seven-month "interval history" report with the following impressions: chest pain/angina; coronary artery disease with a history of percutaneous intervention to left anterior descending artery 4 month returned; morbid obesity; and tobacco abuse. The EKG test recorded a 68, making bradycardia no longer an issue. Dr. Sandella prescribed Chantix to help end the claimant's smoking habit. The record does not show

the claimant visiting Dr. Sandella again. (R. 646).

Between January 29 and May 19, 2008, the claimant followed-up with Dr. Syed on five occasions.  On each occasion, Dr. Syed reported that the claimant was either somewhat or completely compliant with his hypertension therapy; and that the claimant continued to be morbidly obese; that his cardiovascular and musculoskeletal systems were normal; that his respiratory system was normal, but revealed coarse breath sounds; that his abdomen was soft and tender.  On March 17, the complainant added shortness of breath and headaches as his symptoms, although Dr. Syed indicated normal respiratory function.  On the May 19 visit, the claimant reported that he had back pain, edema, fatigue, and dyspnea.  Dr. Syed noted in the May 19 records that the claimant had normal cardiovasucular functioning except for bilateral carotid bruit and that he planned to schedule a doppler ultrasound to evaluate this condition.

On May 20, 2008, the claimant visited Helen Keller Hospital for a vertebral doppler ultrasound to investigate the carotid bruit. Dr. Fritts, a radiologist with Helen Keller Hospital, interpreted the ultrasound as indicating antegrade flow at normal velocities with no evidence of significant stenosis or plaque formation. (R. 612).

On May 22, 2008, Dr. Syed referred the claimant to Dan Raju, MD, to assess the claimant's symptoms of blood in his stool, generalized abdominal pain, alternating watery diarrhea and constipation, and acid reflux. Dr. Raju's examination found no esophagitis or weight loss. He found that the claimant suffered from altered bowel habits, gastrointestinal bleeding, upper abdominal pain, gastroesophogeal reflux disease (GERD), and obesity. Dr. Raju scheduled an esophagogastroduodenoscopy (EGD) and colonoscopy to assess the source of the hematochezia and abdominal pain and to develop a subsequent treatment plan. (R. 656, 659).

On May 28, 2008, Dr. Raju performed an EGD and colonoscopy on the claimant at Shoals Hospital. Dr. Raju found mild antral erythema, irregular z-line, colon polyps, and small internal hemorrhoids. Following the procedure, Dr. Raju recommended a follow-up in one year, continued use of the proton pump inhibitor to treat the claimant's GERD, and if the biopsies came back positive for H. pylori, a regime of antibiotics. The claimant once again listed his occupation as "disabled" on the hospital intake forms. (R. 651, 662-663).

On June 11, 2008, the claimant visited Dr. Syed for a follow-up visit, complaining of gastro-esophageal reflux, edema, fatigue, back pain, and dyspnea. Dr. Syed found the claimant completely compliant to therapy for hypertension and hypercholesterolemia. Dr. Syed noted that the claimant had lost weight since his previous visit, and was no longer in distress as a result of his morbid obesity. (R. 626-27). According to the record, claimant weighed 429 pounds, which was down from his down from his May 19, 2008 weight of 438.4 pounds, but up from his March 17, 2008 weight of 426 pounds. (R. 480, 496, 627). After the examination June 11, 2008, Dr. Syed noted the claimant's normal musculoskeletal gait and station, normal cardiovascular functioning with no presence of edema or carotid bruit, and lessened breath sounds attributable to the claimant's weight. The claimant's abdomen was soft, non-tender, and obese. The claimant did not mention any ear, nose, or throat ailments, or problems with diarrhea. (R. 626-27).

On July 16, 2008, Dr. Syed wrote a brief statement on behalf of the claimant expressing his medical opinion that because of the claimant's "body habitus and medical problems," Dr. Syed believed "it would be difficult for [the claimant] to work." (R. 643).

*Mental Limitations*

According to his notes, Dr. Syed evaluated the claimant four times for indications of

18

abnormal psychiatric functioning prior to the claimant's visiting a mental health specialist. At those visits, on May 17, May 24, July 6, and August 3, 2006, the claimant uniformly reported anxiety and depression. On two of those visits, May 17, and July 6, 2006, Dr. Syed's observations directly contradicted the claimant's self-description; he found the claimant's mood, affect, speech, language, and thought to be normal.  From the very first visit, however, Dr. Syed treated the claimant for these conditions with Lexapro, and, as of August 3, 2006, Wellbutrin. (R. 274-275, 283, 296-297, 299, 427-429).

On August 17, 2006, the claimant visited Bonnie Atkinson, Ph.D., L.L.C., a consulting psychologist, on referral by the Disability Determination Office of the Social Security Administration, for a comprehensive psychological evaluation. Dr. Atkinson began her report by reviewing the claimant's medical history, psychiatric history, psycho-social history, personal appearance, and behavior. Next, Dr. Atkinson conducted a mental status exam on the claimant. In her report, Dr. Atkinson described emotional/affective symptoms and summarized the claimant's adaptive living skills, such as his living situation, capacity to do housework, and hobbies and social activities. (R. 321-326).

In the final step, Dr. Atkinson offered her clinical judgment. Her prognosis was "good." Dr. Atkinson found that the claimant had sufficient judgment to make acceptable work decisions and manage his own funds. Although noting the presence of the claimant's enlarged heart, morbid obesity, hypertension, and hypercholesterolemia, Dr. Atkinson established a Global Assessment of Functioning score of 65-70 signifying only mild limitations. This value supported Dr. Atkinson's conclusion that the claimant did not suffer from severe mental illness or retardation and that the claimant's mental condition was unlikely to change or improve in the

coming 12 months without an improvement in his physical condition. (R. 326-327).

On the same day that the claimant visited Dr. Atkinson, he paid a visit to Dr. Syed. Consistent with his observations from August 3, 2006, Dr. Syed's notes showed the claimant to have an anxious mood, but stated that the treatment plan, and Wellbutrin specifically, was having its intended effect. (R. 418-419).

On August 28, 2006, the claimant filled out a referral form for intake at Riverbend Center for Mental Health. The claimant booked an appointment for September 12, 2006, and listed his presenting problem as "depression" treated by Wellbutrin. Although the claimant had already filed his second disability application and was awaiting a determination on that claim[2], the claimant listed his employment status as "unemployed, looking" on the accompanying demographic information page.  (R. 371-372).

On September 12, 2006, the claimant enrolled as an outpatient at Riverbend Center for Mental Health following referral by Dr. Atkinson for depression. On September 15, 2006, the claimant's amended onset date for disability, a staffer at RCMH completed an integrated diagnostic summary/review of the claimant's mental health. The staffer stated that the claimant met the diagnosis and disability criteria for serious mental illness. Supporting that diagnosis, the staffer cited the claimant's GAF score of 48 and the claimant's reported symptoms of depression, crying, isolation, paranoia, decreasing memory, increasing anxiety, and decreasing sleep. Completing the summary, the staffer found no risk of self-injury or homicidal ideation in the claimant. The claimant did report seeing an hallucination. The summary is unspecific as to who

---

[2]The social security administration denied the claimant's second disability application on September 14, 2006, only two days after the claimant's first appointment with RCMH.

made these findings, but at the bottom of the page is an illegible reviewing psychiatrist's signature, which may belong to Dr. Georgie Stanford with whom the claimant had an appointment on October 4, 2006.  The claimant had also scheduled a follow-up appointment with staff for September 19, 2006. (R. 33, 362-363, 372).

On September 13, 2006, Frank Nuckols, MD, a consulting psychiatrist, completed a psychiatric review technique form, without the benefit of RCMH's summary. He found that the claimant suffered from an adjustment disorder with mixed anxiety and depression that created moderate function limitations with respect to the claimant's activities of daily living and maintaining social functioning and mild limitations in maintaining concentration, persistence, or pace. (R. 339, 346).

Also, Dr. Nuckols completed a mental RFC assessment. He based this assessment on his psychiatric review technique. Dr. Nuckols found the claimant possessed moderate limitations in seven categories: 1) the ability to understand and remember detailed instructions; 2) the ability to carry out detailed instructions; 3) the ability to maintain attention and concentration for extended periods; 4) the ability to complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; 5) the ability to interact appropriately with the general public; 6) the ability to accept instructions and respond appropriately to criticism from supervisors; 7) the ability to respond appropriately to changes in the work setting. Dr. Nuckols deemed all other categories as not significantly limited. Dr. Nuckols' functional capacity assessment did not consider the claimant unable to work. However, Dr. Nuckols considered it necessary for the claimant to have regular breaks, familiar co-workers, and infrequent contact with the public in

any employment setting. (R. 350-352).

On September 18, 2006, the claimant returned to Dr. Syed reporting anxiety and feelings of depression. In contrast to recent prior visits, Dr. Syed's notes showed that the claimant possessed normal mood, speech, and thought process. Nonetheless, Dr. Syed noted that he would change the claimant's prescription for Lexapro to Effexor. (R. 414-417).

On September 19, 2006, the claimant returned to RCMH for an individual therapy session. The claimant experienced decreased anxiety, increased coping, and better mood stability following this session. (R. 598).

On September 21, 2006, the claimant attended group therapy at RCMH. Two different staff members completed progress notes on the claimant. The first staffer noted that the claimant was on time and that he was alert and responsive. Collectively, the group reviewed a handout entitled "Are You Under Stress" and then, individually, completed the Mistaken Beliefs Questionnaire and reviewed the results. The first staffer noted that the claimant progressed by sharing his results of his Mistaken Belief Questionnaire with the group as well as what he does to reduce his stress. The second staffer noted that the claimant learned about identifying stress triggers, while stating that the claimant displayed signs of assessing and identifying how to cope with his stress. Both staffers indicated a treatment plan of weekly practice skills in group therapy. The record has no evidence that the claimant attended another therapy session, group or individual, until August, 2007. (R. 599-600).

In the interval between the claimant's group therapy visit at RCMH in September, 2006, and Dr. Nuckols' completion of a second mental RFC assessment in April, 2007, Dr. Syed observed the claimant's psychiatric state on five separate occasions. At each visit, on December

22

5, 2006, and January 4, January 18, February 7, and March 12, 2007, Dr. Syed noted the absence

of any indication of abnormal psychiatric functioning. He repeatedly described the claimant as

having normal mood, affect, speech, language, and thought. On March 12, 2007, Dr. Syed added

further detail, noting that the claimant appeared alert; oriented to person, place, and time;

possessed of normal behavior, attention, and concentration; and free from anxiety, depression,

irrational fears, delusions, compulsions, hallucinations, or flight of ideas. (R. 395, 398, 403, 407,

411).

The claimant's self-descriptions varied. In December, 2006, the claimant reported feelings

of anxiety and depression. However, at both visits in January, 2007, the claimant stated he was

satisfied with life and not depressed. By February, 2007, and reiterated at the March, 2007 visit,

the claimant once again reported he suffered from depression and anxiety. (R. 394, 398, 403,

406, 410).

The claimant's medications also varied over this period. The absence of any evidence of

the claimant's visit to Dr. Syed on October 2, 2006 complicates charting this progression.

Nonetheless, the record shows that by the December 5, 2006 visit, the claimant had resumed

taking Lexapro and ceased taking Effexor. On January 4, 2007, Dr. Syed removed the claimant

from Lexapro entirely following the claimant's statement that he was "satisfied with life."

However, at the January 18, 2007 visit, the prescription record once again included Lexapro and

Wellbutrin. On February 7, 2007, Dr. Syed noted treatment for depression and anxiety using

Effexor, but only Lexapro and Wellbutrin appeared in the list of medications. At the March 12,

2007 visit, Dr. Syed dropped Wellbutrin from the listed medications, leaving only Lexapro to

treat the claimant's alleged mental conditions. (R. 396, 398, 400, 403, 405-406, 409, 413).

On April 11, 2007, Dr. Nuckols completed a new psychiatric review technique. He diagnosed major depressive disorder that was recurrent and severe. Additionally, he cited an anxiety disorder.  In his summary of the functional limitations, Dr. Nuckols found a moderate limitation in the claimant's ability to maintain concentration, persistence, or pace. Dr. Nuckols found mild limitations in the area of activities of daily living and maintaining social functioning. (R. 453, 455, 460).

When Dr. Nuckols completed the mental RFC assessment on April 11, 2007, he found moderate limitations in the same seven categories: 1) the ability to understand and remember detailed instructions; 2) the ability to carry out detailed instructions; 3) the ability to maintain attention and concentration for extended periods; 4) the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; 5) the ability to interact appropriately with the general public; 6) the ability to accept instructions and respond appropriately to criticism from supervisors; 7) the ability to respond appropriately to changes in the work setting. Dr. Nuckols concluded that the claimant is able to complete an 8 hour workday with breaks. He concluded that the claimant had a concentration span of two or more hours for task completion; that the claimant's interactions with the public should be infrequent; and that any changes in the claimant's work environment should be infrequent and gradual. (R. 472-474).

Between April and August 2007, the record contains five visits to Dr. Syed that address the question of whether the claimant possessed abnormal psychiatric functioning. At these visits, on May 10, May 17, June 6, June 18, and July 25, 2007, the claimant consistently reported feelings of anxiety and depression. By contrast, at each of the May and June 2007 visits, where

Dr. Syed recorded any evaluation of the claimant's psychiatric state, he described it as functioning normally. On June 6 and June 18, 2007, Dr. Syed offered the same summary as he recorded on March 12, 2007: claimant appeared alert; oriented to person, place, and time; possessed of normal behavior, attention, and concentration; and free from anxiety, depression, irrational fears, delusions, compulsions, hallucinations, or flight of ideas. Only on July 25, 2007 did Dr. Syed record the claimant as having an anxious mood. This finding compelled Dr. Syed to refer the claimant to RCMH for additional examination. (R. 550-551, 553-554, 567-568, 571, 577-578).

On August 6, 2007, the claimant returned to RCMH. Pamela Hardin, a staffer, noted that the claimant reported an increase in depressive symptoms because of lack of money, an increase in agitation, and chronic chest pain. The claimant scheduled a follow-up visit with Dr. Stanford for October 11, 2007, but the record does not contain evidence of this or any future visit with Dr. Stanford. (R. 586).

Between the claimant's August, 2007 visit to RCMH and his July, 2008 ALJ hearing, the claimant made twelve additional doctor's visits in which he was evaluated for his alleged depression. The claimant visited Dr. Syed on September 13, 2007, and again on September 25, 2007. At both visits, the claimant reported himself satisfied with life and not depressed, and Dr. Syed found no behavioral indicators of the same. (R. 529-530, 537-538).

These visits sandwiched a September 24, 2007 stop at Shoals Hospital for treatment related to physical symptoms. As part of intake, Dr. Mollohan reviewed and could not find any evidence that the claimant suffered from depression, anxiety, sleeplessness, hopelessness, hallucinations, or suicidal thoughts. (R. 691).

On a visit to Dr. Syed on October 5, 2007, however, the claimant described himself as anxious and depressed. Dr. Syed did not note any external signs of abnormal psychiatric functioning at this visit. (R. 524). Two months later on December 28, 2007 at Helen Keller Hospital, as part of the intake form for chest pain, Amorette Miller, MD, assessed the claimant's psychiatric state, finding normal mood and affect and normal orientation to person, place, and time. (R. 617).

The claimant reported suffering from anxiety and depression on his next six visits to Dr. Syed. While the claimant only offered a general statement that he felt anxiety and depression on his visits on January 10, January 29, and February 13, 2008, the claimant cited specific grounds for his feelings of anxiety on his February 25, March 17, and May 19, 2008 visits: the hospitalization of his granddaughter. (R. 480, 497, 501, 507, 511, 515).

Underscoring the reality of the claimant's statements, Dr. Syed found no external signs that the claimant suffered from anxiety or depression during his visits on January 10, January 29 and February 13, 2008, but noted the claimant as being "very upset" and anxious, but not suicidal or homicidal, in his records from claimant's visits on February 25, March 17, and May 19, 2008. (R. 480, 497, 501, 508, 512, 516).

On June 11, 2008, the claimant's final visit to Dr. Syed before his ALJ hearing, the claimant reported himself as "satisfied with life, not depressed." Consistent with the claimant's self-description was Dr. Syed's detailed but unremarkable evaluation of external indications of abnormal psychiatric functioning. The claimant, according to Dr. Syed had "no anxiety or depression." (R. 627-628).

26

*The ALJ Hearing*

After the Commissioner denied the claimant's request for Social Security and Supplemental Security Income disability benefits, the claimant requested and received a hearing before an ALJ on July 18, 2008. (R. 46, 51).

At the hearing, the claimant offered testimony in response to questioning from his attorney and the ALJ regarding his claimed impairments of obesity, edema, lumbago, shortness of breath, fatigue, coronary artery disease, migraines, tobacco abuse, gastrointestinal distress, and hypertension while providing contextual testimony regarding his daily activities and sources of income. (R. 707-722).

The claimant testified to his steps to combat his obesity. At the time of his hearing, he weighed 423 pounds, down from a high of 438 pounds. The claimant attributed the decline to changes in diet, such as ending consumption of sugar and bread. Beyond serving as a general risk factor, the claimant testified that his size prevented him from locating appropriate work attire, as well as fitting in some chairs. (R. 712-713).

The claimant also testified to the problems edema causes him. He claimed that he typically suffers from edema of the extremities overnight and that the swelling keeps him from easily standing, walking about, or being active. Furthermore, to combat his edema, the claimant testified that his most comfortable position is with his feet propped up above his knees, but that he only can do so while he is in bed. The claimant did not specify whether he was supine. (R. 713-714).

The claimant testified that in addition to the edema, more than a few minutes standing causes him severe back pain. However, the claimant testified that sitting down does not cure his

lumbago, and that after fifteen minutes, the lumbago begins affecting his hips as well. Upon questioning by the ALJ, the claimant reiterated that excessive periods of sitting cause him back pain. (R. 713, 721).

The claimant testified that two hours upright would leave him out of breath. The claimant further testified that household chores, such as sweeping the living room for twenty to thirty minutes at a time, would leave him out of breath and require him to sit down. The claimant stated that his shortness of breath negatively impacted his lifestyle as it prevented him from keeping his home as clean and neat as he liked. The claimant attributed his shortness of breath to asthma, indicating that his breathing was worse when he was in a room without windows. (R. 714-716, 718).

The claimant testified that he suffered frequent fatigue caused by his inability to sleep more than two-three hours in a night. (R. 714-715).

The claimant testified at length regarding his heart trouble. The claimant testified that his cardiologist, Dr. Sandella, instructed him not to lift more than five pounds. The claimant also testified that recent chest x-rays showed arterial problems that would lead him to visit Dr. Sandella again soon. During examination by the ALJ, the claimant testified that his heart problems are partly inherited as both he and his mother share an enlarged heart. The claimant stated that one consequence of his enlarged heart is that most any trigger will cause chest pain like "somebody's sticking a knife in [his heart]." Furthermore, the claimant testified that his heart trouble prevents him from going into direct sunlight. Additionally, the claimant testified his heart will start racing while he's asleep and keep him from sleeping throughout the night. (R. 716, 719-720).

28

The claimant briefly addressed the subject of his migraines, testifying that they occurred every other day and affected his vision. The claimant testified that his headaches were so bad that he had to walk elsewhere and stand by himself. (R. 717).

The claimant testified that he had quit smoking two months prior to the hearing. The claimant testified that he had tried to quit before but that this most recent attempt was the most successful; he expressed remorse that he had ever started smoking in the first place. (R. 717).

The claimant did not testify specifically about his esophagitis or diarrhea. However, he did testify regarding his episode of vomiting blood, stating that the hospital was unable to ascertain the cause for the episode. (R. 719).

The claimant also testified regarding his blood pressure and medication. He stated that he takes "four pills a day" for his high blood pressure, that it is "almost normal," and that he does not suffer any side effects from his medication. (R. 721-722).

Interspersed with his various ailments, the claimant offered testimony regarding his postural limitations, daily activities, living situation, and source of income. The claimant testified that he could sit down; that he did not know if he could crawl; that he had trouble standing up from a seated position; and that he was unable to bend down or bend over. The claimant stated that his impairments regularly interrupt his daily activities because of the way they hinder his ability to clean and maintain the house. Finally, the claimant testified that although his only source of income is food stamps, he does not live in government housing. The claimant additionally testified that he had not completed higher than the 9th grade. (R. 710, 715-716, 722).

Melissa Neel, a vocational expert, testified as to the DOT descriptions of the claimant's prior relevant work. She described those positions as "light-unskilled" for a cashier checker and

"medium-unskilled" as a stocker or store's laborer. (R. 709).

The ALJ posed a hypothetical to Ms. Neel after the claimant's testimony asking her to take into account the limitations expressed by the claimant. The ALJ asked Ms. Neel whether any work existed for someone of the same age, education, and vocational background as the claimant, confined to sedentary work, and experiencing the same additional restrictions imposed by his knees and ankle swelling, obesity, and breathing difficulties. The ALJ expressed these additional limitations as the elimination of commercial driving; moving machinery; all work at open heights, ladders or other climbing devices; any lower extremity push-pull manipulation; complete avoidance of exposure to allergens and pulmonary irritants; and occasional restrictions to all other postural movements, such as climbing a ramp/stairs, balancing, stooping, kneeling, crouching, or crawling. The ALJ asked Ms. Neel to set aside any mental allegations for the purposes of this hypothetical.  The ALJ asked if the preceding hypothetical would eliminate all past relevant work of the claimant, to which Ms. Neel answered in the affirmative. (R. 723).

In consideration of the above hypothetical, Ms. Neel identified three possible positions reflecting sedentary, unskilled labor that exist in significant supply in the national and regional economy: production workers, inspectors, and small parts assemblers. (R. 724).

Ultimately, the ALJ did not pose a hypothetical question to Ms. Neel requiring her to consider the claimant's alleged mental impairments.

Finally, the claimant's attorney posed several hypothetical questions to Ms. Neel regarding the sedentary positions that she had identified.  In response to a question regarding what effect a finding that the claimant would have to elevate his feet "knee high" would have the claimant's ability to secure other work,  Ms. Neel replied that if this requirement were limited to

30

break times and lunch, the claimant could still work. But, Ms. Neel stated that if the claimant had to keep his legs elevated for longer than the time afforded to the claimant on breaks or lunch, then the claimant would be disabled. (R. 725).

Finally, the claimant's counsel asked Ms. Neel what effect a finding that the claimant could not work on the same schedule as contained in the job description of the employer would have. Ms. Neel replied that this scenario would result in the claimant being disabled. (R. 726).

*The ALJ's Decision*

On August 14, 2008, the ALJ issued a decision finding the claimant was not disabled under the Social Security Act. (R. 10).

The ALJ determined that the claimant met the insured status requirements of the Social Security Act with respect to his Title II claim. The ALJ then found that the claimant had not engaged in substantial gainful activity since the alleged onset of his disability. (R. 16).

Next, the ALJ found that the claimant suffered from the following severe impairments: hypertension, hypercholesterolemia, morbid obesity, migraine headaches, obstructive sleep apnea, coronary artery disease status post stent placement, arteriovenous malformation right frontal lobe, bronchitis, pharyngitis/esophagitis, lumbago, edema (pedal), and tobacco abuse. However, the ALJ found that neither the claimant's alleged depression nor his chronic diarrhea constituted a severe impairment. (R. 16).

To support his finding that the claimant's depression was not a severe impairment, the ALJ gave more weight to the findings of Dr. Atkinson and Dr. Syed's month-to-month patient descriptions than he gave to Dr. Nuckol's mental RFC assessment and the intake form a staffer at RCMH completed. The ALJ indicated that he assigned greater weight to those two sources

31

because Dr. Atkinson examined the patient, while Dr. Nuckols did not, and Dr. Syed regularly treated the claimant, while Dr. Stanford at RCMH did not. The ALJ noted Dr. Syed's record of the claimant's lack of suicidal or homicidal ideation, as well as Dr. Syed's observations of the claimant indicating normal mood, affect, speech, language, thoughts, attention, concentration, and the corresponding lack of compulsions, irrational fears, or delusions. The ALJ underscored this point through discussion of the multiple visits at which Dr. Syed found the claimant had no symptoms of depression, despite his lack of treatment. The ALJ noted that Dr. Atkinson found only mild limitations in the claimant's daily living activities, maintaining social functioning, and maintaining concentration, persistence, and pace. The ALJ declared that under the applicable regulations, if the claimant's mental impairments cause no more than a "mild" limitation in any of those three functional areas and no limitations in a fourth area inconsistent with the claimant's reported symptoms, the impairment qualifies it as a non-severe impairment. (R. 16-17).

To support his finding of chronic diarrhea as a non-severe impairment, the ALJ relied on the claimant's self-admission that the condition has persisted for 20 years. The ALJ noted that the claimant worked throughout this period. The ALJ attached particular significance to the medical records of Dr. Syed that did not reflect a worsening of this condition on those occasions on which the claimant mentioned it at all. The ALJ also found telling on this point the impressions of Dr. Raju, who performed a colonoscopy and EGD and found mild symptoms and attributed the claimant's medical history on the subject of diarrhea to altered bowel habits. Finally, the ALJ found that the claimant has not alleged limitations as a result of this impairment. (R. 17).

The ALJ concluded, however, that these impairments did not singly or in combination manifest the specific signs and diagnostic findings required by the Listing of Impairments. The

ALJ supported this decision by referencing the claimant's statement from the pre-hearing order stipulating that none of the alleged severe impairments met the listings. (R. 18).

The ALJ's decision next addressed the claimant's RFC.  He found that the claimant's RFC permitted him to engage in sedentary work, with additional restrictions of no commercial driving; no work around moving machinery and at open heights; no use of ladders or other climbing devices; and no pushing or pulling with his lower extremities. The ALJ determined that although the claimant's alleged symptoms might reasonably have been caused by the identified severe impairments, the stated duration and severity were not credible where they contradicted the findings of the RFC assessment. In support of his conclusion regarding the unremarkable "intensity, persistence, and limiting effects" of these symptoms, the ALJ examined in significant detail the records of Dr. Syed, the claimant's treating physician; Dr. Sandella, the treating cardiologist; Dr. Raju, the treating gastroenterologist; and Dr. Adderholt, the treating neurologist. (R. 15, 19, 22).

On the subject of hypertension, the ALJ noted that the claimant had suffered from this impairment for many years prior to alleging disability, periods during which the claimant was engaged in or seeking work. Moreover, the ALJ observed that Dr. Syed's records showed this condition responded successfully to treatment. In the ALJ's judgment, such facts strongly suggest that the persistence of this condition does not introduce sufficiently limiting effects that the claimant might be considered disabled. (R. 23-24).

The ALJ noted that the prescribed medications effectively controlled "multiple conditions" and that the claimant reported no side effects as a result of his medications. Thus, the ALJ did not consider hypercholesterolemia to be an adequate basis for alleging disability. (R. 18,

23).

The ALJ found a persistent symptom of obesity in the claimant going back at least five years. The ALJ reviewed the claimant's testimony regarding his current weight and height and found it to be deleterious to his medical condition. The ALJ noted, however, that the claimant did not testify to any functional limitations with specificity beyond difficulty finding clothes and sitting in some chairs. The ALJ utilized the claimant's answers to various DDS questionnaires and surveys regarding his daily activities, such as the claimant's ability to do the dishes and make food, to substantiate his conclusion. Thus, the ALJ determined that the claimant's morbid obesity was not a practical limitation on the claimant's ability to find work. (R. 22)

The ALJ did not find the allegations of frequent, disabling migraines credible. The ALJ found that the claimant did not allege migraine headaches as an impairment either in his initial application nor even just prior to the hearing, but only during his testimony. While the ALJ conceded the diagnosis of headaches among Dr. Syed's records, the ALJ found their occurrence merely sporadic. As a consequence, the ALJ found that the claimant's headaches were not of the "frequency, duration, or intensity" to prevent basic work activities. (R. 22)

In investigating the claimant's reporting of headaches, the ALJ also considered the neurological evidence for the arteriovenous malformation of the right frontal lobe. The ALJ found that the MRI did substantiate the existence of a cavernous hemangioma, but gave strong weight to the examining neurologist, Dr. Adderholt, who found the claimant asymptomatic and free from evidence of recent hemorrhage. Absent symptoms, the ALJ found the arteriovenous malformation of the right frontal lobe an inadequate basis for a finding of disability. (R. 22)

The ALJ did not find the allegations of fatigue and sleep apnea convincing in light of the

medical evidence. Although the ALJ cited the claimant's testimony regarding his inability to sleep, as well as Dr. Syed's diagnosis of "unspecified insomnia," the ALJ found that Dr. Syed had also prescribed medication to treat the insomnia with some success. The ALJ considered it significant that the claimant had not purchased or been prescribed medication for insomnia throughout 2008. Additionally, the ALJ found that the medical record did not support a finding of daily fatigue, pointing to one visit with Dr. Sandella in June 2007 at which the claimant appeared "alert." (R. 20).

The ALJ did not find the claimant's testimony regarding the disabling effects of coronary artery disease post-stent consistent with the medical record on the subject. In particular, the ALJ determined that the claimant's allegation that he cannot be in direct sunlight is unsupported in the record. He also noted that the claimant's chest pain is itself an intermittent phenomenon. The ALJ observed that although Dr. Sandella treated the claimant for coronary artery disease through insertion of a stent, Dr. Sandella did not consider it a critical or clinically significant disease. The ALJ did find that Dr. Sandella had diagnosed the claimant with bradycardia but, consistent with Dr. Sandella's own notes on the subject, determined it to be iatrogenic and correctable via adjustments in the claimant's medication. Further, the ALJ found that the claimant did not likely suffer disabling symptoms as a result of his alleged and diagnosed cardiovascular issues because the claimant did not complete a scheduled follow-up visit in the six months preceding the ALJ hearing. The ALJ reasoned that were the impairments as severe as alleged, the claimant would have visited the doctor. Finally, the ALJ did not locate in the record any evidence of permanent restrictions by Dr. Sandella following the placement of claimant's stents. (R. 21-22).

The ALJ considered the claimant's testimony regarding his alleged asthma inconsistent

with the medical record. The ALJ based his finding on the multiple occasions on which the claimant himself denied shortness of breath coupled with repeated imaging that was negative for lung disease. Additionally, the ALJ found that the claimant was capable of managing his condition through an inhaler and medication. (R. 20-21).

The ALJ found that the claimant had and does suffer from occasional, but recurrent, upper respiratory infections, such as bronchitis or sinusitis. However, the ALJ concluded that no physician has found these conditions to be so disabling as to require introduction of restrictive work environments. The ALJ nonetheless took the claimant's asthma into account in determining the RFC by restricting the claimant's work environment to one free from "pulmonary irritants." (R. 20-21).

On the subject of tobacco abuse, the ALJ mentioned that Dr. Sandella's treatment plan for the claimant included smoking cessation. The ALJ emphasized that the claimant's last visit with Dr. Sandella was in January, 2008, and the claimant did not cease smoking until two months before the hearing on July 18, 2008. (R. 21-22).

The ALJ found that the claimant's allegations that lumbago prevented him from completing sedentary work were inconsistent with the claimant's medical record. For evidence, the ALJ cited imaging from January 2008 showing no abnormalities in the pelvis, as well as the records of Dr. Syed that showed tenderness to palpation in his lumbar area, but without any decrease in range of motion. The ALJ also considered the opinions of the claimant's consulting examiners, Ms. Henderson and Ms. Johnson, who repeatedly confirmed the initial impression of no impairment affecting his ability to sit, stand, walk, or carry between ten-twenty pounds. (R. 19-20).

36

On the claimant's allegations of edema, the ALJ found that the claimant's condition was only occasional and, thus, fell short of the standard necessary to impair the claimant's ability to complete sedentary work. The ALJ relied on the medical records that showed on those occasions where Dr. Syed or other physicians had found edema, the swelling was minimal and would frequently fade even when compliance with therapy was low. The ALJ highlighted the sequence of the claimant's May 2008 visit with Dr. Syed, who found edema and instructed the claimant to elevate his legs. The ALJ then noted Dr. Raju found no edema two weeks later. Thus, the ALJ did not deem the need to elevate his legs a persistent condition. As additional evidence in support of his decision, the ALJ cited the lack of hospitalization or emergency treatment related to edema and the claimant's strong track record of controlling the condition. (R. 20).

Although the ALJ found pharyngitis/esophagitis to be among the claimant's severe impairments, he did not discuss any reasons why he did not consider pharyngitis/esophagitis so disabling as to prevent substantial gainful activity, as he did with the other impairments he deemed severe. (R. 16).

The ALJ apportioned some of his discussion regarding the claimant's credibility to the claimant's self-described abilities and activities. The ALJ found that the claimant reported the ability to "sit for 40 minutes continuously, walk 25 minutes continuously, and stand 15 minutes continuously" in a questionnaire supplied by the Disability Determination Service in 2006. A Disability Determination Service cardiovascular questionnaire he filled out in 2007 contained the admission he can walk four blocks at a stretch. Similarly, the ALJ noted the claimant's ability to cook, wash dishes, and hold his grandchildren while sitting without incurring shortness of breath. (R. 23).

37

Likewise, the ALJ noted that at various times the claimant reported to Dr. Atkinson, RCMH, and Dr. Syed that his daily or weekly activities included walking in the park, dusting, cleaning house, washing dishes, doing laundry, sweeping, preparing simple meals, self-grooming, shopping, dressing himself, visiting with family and friends, talking on the telephone, and watching television and his grandchildren. The ALJ found all of these capabilities consistent with the demands of sedentary labor, subject to the additional restrictions the ALJ imposed on account of the claimant's body habitus. Finally, the ALJ considered significant that on the intake form at a mental health center three days before his alleged onset date, and while he awaited the results of a previously filed disability claim, the claimant listed himself as "'unemployed, looking'" rather than as "disabled." (R. 23).

In comparing the claimant's testimony to the independently compiled medical record, the ALJ found the claimant's testimony inconsistent, misleading, and not credible. As a case in point, the ALJ highlighted the widely divergent responses claimant gave to his last level of education: eighth grade at the ALJ hearing in 2008; tenth grade to examining physicians in 2005 and 2006; and eleventh grade to a mental health center in 2006. (R. 24).

The ALJ discussed the Medical Source Opinion of Dr. Syed from July 2008 stating that the claimant was obese and would have difficulty working. The ALJ ultimately gave it little weight because he found the opinion itself lacking in objective and clinical evidence. Further, the ALJ observed that the MSO contradicted Dr. Syed's own treatment records showing that the claimant possessed normal functioning on examination, no functional limitations attributable to the claimant's morbid obesity, and no functional restrictions imposed by Dr. Syed. The ALJ also questioned whether Dr. Syed had access to the claimant's medical history with Dr. Sandella or

Dr. Raju, neither of whom imposed functional restrictions on the claimant after performing their procedures. (R. 24).

The ALJ concluded by describing the sources of his conclusion finding the claimant to possess a sedentary RFC: the claimant's activities of daily living; the claimant's own statements of his abilities; the absence of objective medical findings on the claimant precluding sedentary work; and the absence of evidence indicating the claimant experienced disabling pain. (R. 24-25).

The ALJ then considered whether the claimant's RFC of sedentary work permitted the claimant to complete past relevant work. Relying on the testimony of the vocational expert, Ms. Neel, the ALJ found that the claimant could not complete past relevant work. (R. 25).

The ALJ next made findings regarding the claimant's age, education, and transferability of job skills. The ALJ found that the claimant was forty-two years old based on the amended onset date, classifying him as a younger individual; that the claimant had a limited education with the ability to communicate in English; and that the transferability of job skills was not at issue because his finding that the claimant was not disabled did not depend on this fact. (R. 25).

The ALJ considered whether the identifiable severe impairments permitted the claimant to complete any other work in the national economy consistent with the claimant's RFC, age, education, and work experience. Utilizing the testimony of the vocational expert in conjunction with his own findings on the claimant's RFC, age, education, and work experience, the ALJ concluded that the claimant retains the capacity for work as a production worker, inspector, or small parts assembler. The ALJ found that these jobs exist in significant numbers regionally and nationally. Therefore, the ALJ concluded that the claimant was not disabled under the Social

Security Act. (R. 15, 26).

# VI. DISCUSSION

This judicial review proceeds in spite of the plaintiff's decision not to file a brief. Current policy within the Northern District of Alabama is to require an initial brief from all parties unless the plaintiff proceeds pro se; the claimant has counsel of record in this case. The District Court Clerk's letter to plaintiff's counsel of April 9, 2012, however, stated that the Northern District of Alabama did not require a brief to review the decision of the Commissioner. At that time, in the event of non-filing by the plaintiff, the policy of the Northern District of Alabama was nonetheless to review the Commissioner's decision with respect to the applicable legal standards and whether substantial evidence supported the ALJ's factual findings. *See, e.g. Mitchell v. Apfel*, 1999 U.S. Dist. LEXIS 17549, at *10 (N.D. Ala. 1999). Thus, this court will review the decision in view of the applicable legal standards and whether substantial evidence supported the factual findings.

## *Determination of Severe Impairments*

The claimant argues that the ALJ did not correctly apply the legal standard, nor support it with substantial evidence, in determining that the claimant's alleged depression, anxiety, and chronic diarrhea were not severe impairments. However, this court finds that the ALJ correctly applied the legal standard and supported it with substantial evidence in determining that the claimant's alleged depression, anxiety, and chronic diarrhea were not severe impairments.

A severe impairment must cause a significant limitation in the claimant's basic work activities. 20 C.F.R. § 404.1521(a); 20 C.F.R. § 416.920(c). Basic work activities include, but are not limited to, physical functions, sensory perceptions, cognition, judgment, social interaction,

and adaptation. 20 C.F.R. § 404.1521(b); 20 C.F.R. § 416.921(b).

The claimant had the burden to produce evidence showing that his depression, anxiety, and chronic diarrhea caused significant limitations to his basic work activities. After considering the evidence, the ALJ found just the opposite to be true.

Regarding the claimant's depression and anxiety, the ALJ noted that the consulting, examining psychologist, Dr. Atkinson, described the claimant as having an ability to function with only mild limitations and specifically mentioned her opinion that the claimant could make acceptable work decisions and manage his own funds. (R. 326). Dr. Syed's examination records buttress Dr. Atkinson's opinions. On seventeen of the claimant's twenty-six visits to Dr. Syed that discussed mental health, Dr. Syed observed no external indications of abnormal mental functioning. Furthermore, at the claimant's last visit to Dr. Syed before the ALJ hearing, he reported himself to be satisfied with life. (R. 275, 298, 395, 398, 403, 407, 411, 415, 508, 512, 516, 530, 538, 554, 568, 578, 628). Thus, the record contains more than a scintilla of evidence in favor of the ALJ's decision that the claimant's depression and anxiety did not produce more than a mild limitation, consistent with the applicable legal standard.

The ALJ clearly articulated the reasons he preferred Dr. Atkinson's interpretation over those tendered by Dr. Nuckols and the staffer preparing the RCMH summary. The ALJ noted that Dr. Atkinson's assessment, although precedent to the claimant's alleged onset date, remained consistent with the observed findings of later examiners. The ALJ assigned great weight to the fact that Dr. Atkinson, unlike Dr. Nuckols, examined the claimant. (R. 17).

Additionally, the ALJ remarked that Dr. Nuckols completed his assessment on April 11, 2007, but over a year's worth of visits to Dr. Syed and other health providers followed, the

majority of which corroborate Dr. Atkinson's findings rather than those of Dr. Nuckols. Although the ALJ only indirectly referenced these incidents, the intake forms from Shoals and Helen Keller Hospital emergency rooms in September and December 2007 observed no indications of abnormal psychiatric functioning on the claimant's visit. Those visits came after the final word of both RCMH and Dr. Nuckols. (R. 16-17, 617, 628, 691). The ALJ properly applied the legal standard and substantial evidence supports his finding that the claimant did not suffer from a severe impairment because of his alleged depression or anxiety.

Similarly, the ALJ correctly found the claimant's allegations of chronic diarrhea as non-severe. This court finds the ALJ's comparison of the claimant's 20 year history of this impairment with his concurrent work experience over that time persuasive as an indicator that the condition, as experienced by the claimant, is at most a mild limitation. Further, the ALJ indicated that his review of the record did not show any worsening of the condition over the period under review for this disability claim. To substantiate this finding, the ALJ referenced Dr. Raju's May 22, 2008 examination of the claimant. Dr. Raju concluded that the claimant's alleged diarrhea was nothing other than "altered bowel habits." The ALJ further noted that the claimant denied GI symptoms altogether at the claimant's visit to Dr. Syed the next month. The ALJ applied the proper legal standard and substantial evidence supports his finding that the claimant's chronic diarrhea was not a sever impairment. (R. 17).

*Application of the Eleventh Circuit's Pain Standard*

The claimant argues that the ALJ improperly applied the Eleventh Circuit's pain standard for evaluation of the claimant's subjective complaints. To the contrary, this court finds that the ALJ properly applied the Eleventh Circuit's pain standard and that substantial evidence supports

his decision.

The pain standard applies when a claimant attempts to establish disability through his own testimony of pain or other subjective symptoms. *Holt*, 921 F.2d at 1223. The standard requires the claimant to have demonstrated an underlying medical condition accompanied by *either* objective medical evidence establishing the severity of the claimant's pain resulting from that condition, *or* a finding that the underlying condition itself is so severe as to make the allegations of pain credible. *Holt*, 921 F.2d at 1223. The Eleventh Circuit does not require that the ALJ make specific reference to the language of the pain standard, but only requires him to show through his discussion that he applied the appropriate legal standard. *Wilson*, 284 F.3d at 1225-26. If the ALJ chooses to discredit the claimant's testimony, he must articulate specific reasons for so doing. *Id.* at 1225.

The ALJ found little objective evidence to support the severity of the claimant's lumbago or hip pain, or even the existence of an underlying medical condition. As recently as January, 2008, a pelvic x-ray from Shoals hospital reported unremarkable findings. Thus, medical imaging did not identify a condition severe enough to support a finding of disabling pain. The clinical record does not support this finding either. The ALJ cited a 2005 consultative examination that found no objective evidence that would prevent the claimant from sitting, standing, or walking, nor lifting or carrying between 10-20 pounds. The ALJ's review of Dr. Syed's clinical observations similarly turned up no significant abnormalities of the lumbar region beyond tenderness to palpation never accompanied by loss of range of motion. His records regularly and consistently described normal gait and range of motion with otherwise normal musculoskeletal functioning. (R. 19-20).

43

Paralleling the allegations of lumbago and hip pain, the ALJ did not find objective medical evidence supporting the disabling nature of the claimant's migraines and headaches. The ALJ established that the claimant did not allege an impairment of migraine headaches at the time of his initial application in January, 2007, nor even just prior to his hearing in June 2008. Although the claimant sporadically reported headaches to Dr. Syed in 2006 and 2007, the ALJ deemed more significant the 2006 findings of Dr. Adderholt, a neurosurgeon, who relied on medical imaging to find the claimant asymptomatic. (R. 19, 21).

While the ALJ's discussion of the claimant's medical record in the context of the claimant's alleged headaches, back, and hip pain satisfies the Eleventh Circuit's standard, the ALJ took the additional step of articulating why the claimant has dubious credibility generally. At the ALJ hearing, the claimant reported ceasing his education in eighth grade. The record shows the claimant reported higher levels of education, even telling RCMH he had achieved an eleventh grade education. The level of education is an important determination in evaluating the claimant's ability to perform work in the national economy. The ALJ reasonably noted that the claimant's misleading and inconsistent testimony on an objective matter cast into question the claimant's credibility regarding his subjective complaints. (R. 24).

The ALJ, without referencing the specific language of the pain standard, nonetheless demonstrated through his discussion that he had considered the entirety of the claimant's medical record and had discredited the claimant's subjective testimony based on specific, articulated reasons. Therefore, the ALJ properly applied the pain standard when he discredited the claimant's subjective testimony regarding the limiting effects of his headaches, back, or hip pain.

*Determination of the Claimant's RFC*

The claimant argues that the ALJ's assessment of the claimant's residual functional capacity was inconsistent with the findings of the disability specialist and the record as a whole, including the medical records of the claimant's treating cardiologist, gastroenterologist, neurologist, and internist. On the contrary, this court finds that the ALJ cited substantial evidence consistent with the entirety of the record in reaching his determination that the claimant possessed a RFC to perform sedentary work.

To possess a RFC to do sedentary work, the claimant must be capable of extended periods of sitting; lifting up to 10 pounds; occasionally lifting or carrying docket files, ledgers, and small tools; and occasionally walking or standing. 20 C.F.R. § 404.1567(a); 20 C.F.R. § 416.967(a). Under Social Security Rule 83-10, "occasional" means up to one-third of the time. A typical eight hour day for a sedentary worker should not require more than two hours walking or standing and six hours of sitting. *Kelley v. Apfel*, 185 F.3d 1211, 1213 n. 2 (11th Cir. 1999). A Medical Statement Opinion from the claimant's treating physician declaring the claimant unable to work deserves careful consideration in any finding of disability, however, an ALJ may discount a treating physician's opinion where it is wholly conclusory. *Crawford*, 363 F.3d at 1159.

The claimant's disability specialist, Ms. Johnson, found in completing the claimant's physical RFC assessment that the claimant could frequently lift up to 10 pounds and occasionally lift up to 20 pounds. These restrictions fall comfortably within the sedentary maximum. Similarly, Ms. Johnson found that the claimant could stand or walk for up to six hours in an eight-hour workday, far surpassing the regulatory limit of two hours for sedentary work. The

claimant's maximum of six hours seated in an eight-hour workday also fits within the regulatory guidelines. Finally, Ms. Johnson found only occasional postural or environmental limitations other than an inability to climb scaffolding or ladders, the need for total avoidance of hazards, and the need to avoid concentrated exposure to fumes, odors, gases and other consequences of poor ventilation. (R. 465-468). Notably, Ms. Johnson did not list any manipulative restrictions, but the ALJ still provided for a restriction on the claimant's pushing and pulling with his lower extremities. (R. 18). At the ALJ hearing, a conversation between the vocational expert and the ALJ made clear that the ALJ implemented this limitation in response to the claimant's knees and ankles swelling. (R. 723-724).

The medical record also supports the ALJ's RFC assessment. As discussed, the record does not support Dr. Sandella, Dr. Raju, or Dr. Adderholt as having imposed permanent restrictions upon the claimant, although the claimant testified that Dr. Sandella had told him he could not lift more than five pounds. Without support in the record, and in light of the lessened credibility of the claimant as a result of his inconsistent testimony regarding his education, the ALJ reasonably determined that the 5 pound alleged restriction is not credible. Thus, the ALJ's RFC assessment of a sedentary exertional level is consistent with the medical record as developed by Drs. Sandella, Raju, and Adderholt. (R. 18, 21-22).

Dr. Syed produced a medical statement opinion regarding the claimant's ability to work stating that he believed "it would be difficult for the claimant to work due to his body habitus and medical problems." (R. 645). The ALJ found Dr. Syed's medical statement opinion conclusory and contradicted by the claimant's entire medical history, a permissible ground for ignoring the opinion of a treating physician.  Moreover, while the ALJ included specific postural restrictions

46

in his RFC designed to accommodate the claimant's morbid obesity, Dr. Syed's allusions to the claimant's "medical problems" provide no basis for assessing the source of Dr. Syed's medical opinion. (R. 22). As the ALJ pointed out, the record is unclear as to whether Dr. Syed knew the other physicians had imposed no restrictions.  Other than the opinion two days prior to the ALJ hearing, the ALJ could not find any evidence in the record that Dr. Syed had himself imposed any permanent functional restrictions. (R. 24).

By taking into consideration the entire record of the claimant in determining the claimant's RFC, the ALJ relied on substantial evidence to support his finding of a sedentary exertional level in lieu of the requested disability, while justifiably disregarding the conclusory medical statement opinion of Dr. Syed.

## VII. CONCLUSION

For the reasons as stated, this court concludes that the decision of the Commissioner is supported by substantial evidence and is to be AFFIRMED. The court will enter a separate order to that effect simultaneously.

DONE and ORDERED this 26th day of September, 2013.

_Karon O. Bowdre_
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE